# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ALIECHIA SMITH,

    Plaintiff,

    v.

MIKE DEAL, Individually, and in
his official capacity as City
Manager of the City of Jesup,
Georgia; and DOUG LEWIS, Jesup
Police Department Chief,
individually,

    Defendants.

CV 2:17-143

## ORDER

Plaintiff filed this action seeking damages pursuant to 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1985. Dkt. No. 1. Before the Court is Defendants Mike Deal, in his individual and official capacities, and Doug Lewis's Motion for Summary Judgment, dkt. no. 13, pursuant to Federal Rule of Civil Procedure 56. The Motion has been fully briefed and is ripe for review. For the reasons stated below, Defendants' Motion is **GRANTED**.

## BACKGROUND

Plaintiff Aliechia Smith is an African-American female who worked as a police officer for the City of Jesup for fifteen years. Dkt. No. 20-2 ¶ 1. On May 16, 2017, around 11:30 p.m. Smith was

on duty taking a meal break at her house when she heard over her radio that an officer needed another officer to assist him. Dkt. No. 14-2 at 94. Soon after, Plaintiff received a phone call from Jocelyn, who is the daughter of Plaintiff's longtime girlfriend and who had lived with Plaintiff for a large part of her childhood. Dkt. No. 20-2 ¶¶ 3, 4. Plaintiff views Jocelyn as her own daughter. Id. ¶ 4. Plaintiff did not answer Jocelyn's call but soon after called Jocelyn back, and Jocelyn answered that call. Dkt. No. 14-2 at 94-95. Jocelyn was "hysterical pretty much" and told Plaintiff that she had been stopped and that the officers wanted to search Jocelyn's car. Id. at 95. Plaintiff responded that the officers had no reason to search her car and told Jocelyn to tell them "no." Id.[1] Jocelyn then told the deputy that she was "on the phone with Sergeant Smith, and she told me not to allow y'all to search the vehicle." Dkt. No. 20-2 ¶ 13.

Soon after the phone call ended, Plaintiff heard dispatch ask for a female officer to perform a search incident to Jocelyn's traffic stop. Id. ¶ 17. Plaintiff responded to dispatch that she was en route but that the suspect was like family and thus she

---

[1] Plaintiff testified that immediately after making that statement she heard the deputy say in the background that he did not need Jocelyn's consent to search the car because drugs were found. Plaintiff contends she then told Jocelyn that if that is true they can search her car. Dkt. No. 14-2 at 95. Defendants argue that this statement did not come out during the internal affairs investigation into Plaintiff's conduct. Whether it did or did not will not affect the determinations in this Order.

could not perform the search. Id. Dispatch responded to Plaintiff with "10-22," meaning "[d]isregard, don't come." Dkt. No. 14-2 at 96. Plaintiff ignored the 10-22 command and drove to the traffic stop. Id. While Plaintiff was en route, another City of Jesup officer arrived at the scene of the traffic stop. Dkt. No. 20-2 ¶ 19. The deputies instructed the other officer who had just arrived to leave. Id. ¶ 20. When that officer told Plaintiff that he was instructed to leave, Plaintiff, still en route, ordered him to stay because Jocelyn was involved in the stop. Id. ¶ 21. Plaintiff finally arrived at the scene with the specific intent of checking on Jocelyn. Id. ¶ 22. Plaintiff was told by a supervisor that she needed to leave or stay on the other side of the street; she complied by staying on the other side of the street. Id. ¶¶ 23, 24.

When Chief of Police Glenn Takaki learned of Plaintiff's behavior during the traffic stop, he placed her on administrative leave so an investigation could be performed. Id. ¶ 25. Takaki testified that in order to avoid possible conflicts of interest he concurred with the internal affairs investigator's suggestion that an outside agency conduct the investigation into Plaintiff's actions. Dkt. No. 14-2 at 67. After receiving the final report of the investigation from the outside agency, Takaki concluded that Plaintiff violated the police department's standard operating procedure governing professional image and that she may also have

committed obstruction of the deputies involved in the traffic stop. Dkt. No. 20-2 ¶ 27. Takaki subsequently met with Plaintiff three separate times to discuss the problems with her actions, to try and understand why Plaintiff took those actions, and to find an alternative means of addressing her actions besides termination. Id. ¶ 28. Plaintiff, however, insisted in all three meetings that her conduct was not improper. Id. ¶ 29. Takaki recommended that Plaintiff be terminated because Plaintiff "would not even [ac]knowledge that there was any hint of wrongdoing." Dkt. No. 14-2 at 37.

The City Manager, Defendant Mike Deal, adopted Takaki's recommendation that Plaintiff be terminated. Dkt. No. 15-2 at 38. In Deal's words, his role in Plaintiff's firing was making "the final determination." Id. at 28. Nevertheless, the City of Jesup provides an avenue by which City employees can appeal any adverse employment decision to the City Grievance Committee, which has the authority to affirm or reverse any such decision. Dkt. No. 20-2 ¶ 44. The City Manager is required to notify an employee who is terminated of her right to appeal. Id. ¶ 45. Plaintiff was properly notified and appealed Deal's decision, as she was entitled to do under the City of Jesup Employee Handbook. Id. ¶¶ 34, 46. An evidentiary hearing was held. Id. Section 12 of the City of Jesup Employee Handbook is titled "Grievance and Appeal

AO 72A
(Rev. 8/82)

Procedures." Dkt. No. 14-1 at 11. Sub-section B of Section 12 is entitled "Grievance Committee" and states in relevant part:

> 1. Establishment. There is hereby created a Grievance Committee for the City of Jesup, Georgia, to hear grievances and appeals from personnel regarding actions taken by the city department heads or other supervisory personnel of the city.
>
> . . .
>
> 1.[2] Powers. The Grievance Committee shall hear all matters brought before it under procedures set forth below, and after a hearing may, by a majority vote of the Committee take such action concerning an affected employee as it deems appropriate, including but not limited to: reinstatement with or without full compensation lost, if any, reprimand, suspension, or dismissal from the service of the city.

Id. After the evidentiary hearing in which Takaki and Plaintiff, among others, testified at length, the majority of the Grievance Committee voted to uphold Plaintiff's termination. Dkt. No. 20-2 ¶ 36.

One more incident is relevant to Plaintiff's claims. Approximately two weeks before the traffic stop incident,

---

[2] The Handbook is mis-numbered. This sub-part should be numbered "3." not "1."

AO 72A
(Rev. 8/82)

Defendant Doug Lewis, who at the time was the Chief Deputy of the Wayne County Sheriff's Office, Plaintiff, and other law enforcement officers attended a crisis intervention training class ("C.I.T."). Dkt. No. 15-3 at 42. Before the class started, Lewis and two other men were outside conversing when one of the men began discussing music that had recently been performed by the local high school band. Dkt. No. 20-2 ¶¶ 47, 50. The man then played one of the songs that the band had recently performed. Id. ¶ 51. Lewis stated to the group, "that sounds like rap music." Id. ¶ 52. Plaintiff was standing nearby—no more than twelve to fifteen feet away from the group. Dkt. No. 15-1 at 15. Plaintiff overheard the comment and interjected that "there's going to be some changes around here." Id. Plaintiff testified that Lewis then "grew red-faced [and] visibly angry," dkt. no. 20-2 ¶ 54, and she "felt," based on how they looked at her, that Lewis and another member of the group "got pretty mad," dkt. no. 15-1 at 15. No one in the group verbally responded to Plaintiff's comment. Id. at 16. That was the end of the interaction, and Plaintiff did not have any further interaction with Lewis that day. Id. at 17.

Plaintiff filed this action to recover damages and other compensation, which Plaintiff claims is owed to her under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1985.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting

AO 72A
(Rev. 8/82)

evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Section 1983 First Amendment Retaliation Claims

Plaintiff's first claims, set forth in Count I of the Complaint, are against Defendants Mike Deal in his individual and official capacity as City Manager of the City of Jesup, Georgia, and Doug Lewis in his individual capacity. Plaintiff avers that she was suspended without pay and fired in retaliation for engaging in speech protected by the First Amendment. The allegedly protected speech was the statement she made to Jocelyn that the police needed her consent to search her car, and her comment at the C.I.T. class that "there's going to be some changes around

here." For the reasons stated below, Plaintiff's claims set forth in Count I fail.

## A. Elements of a First Amendment Retaliation Claim

"To state a claim under . . . [§] 1983, a plaintiff must allege that (1) the defendant deprived him [or her] of a right secured under the United States Constitution or federal law and (2) such deprivation occurred under color of state law." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (citing U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1288 (11th Cir. 2001);Arrington v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir. 1998)). In employment retaliation claims, specifically, "[f]or a public employee to establish that an employer conditioned [his or] her job in a way that burdened a constitutional right impermissibly, the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered an adverse employment action for exercising the right." Akins v. Fulton Cnty., Ga., 420 F.3d 1293, 1300 (11th Cir. 2005) (internal citation and quotation marks omitted). Thus,

> [F]or a public employee to establish a prima facie case
> of First Amendment retaliation, [he or] she must show:
> 1) that the speech can be fairly characterized as
> relating to a matter of public concern, 2) that her
> interests as a citizen outweigh the interests of the
> State as an employer, and 3) that the speech played a

9

substantial or motivating role in the government's
decision to take an adverse employment action.

420 F.3d at 1303. "If the plaintiff meets these requirements, the
burden shifts to the employer, who must demonstrate by a
preponderance of the evidence that it would have made the same
employment decision, even had the plaintiff never engaged in the
protected conduct." Rodriguez v. City of Doral, 863 F.3d 1343,
1350 (11th Cir. 2017) (citations omitted).

Turning to the adverse employment action element, "[t]o be
considered an adverse employment action in a First Amendment
retaliation case, the complained-of action must involve an
important condition of employment." Stavropoulos v. Firestone,
361 F.3d 610, 619 (11th Cir. 2004). "A public employee states a
case for retaliation when the alleged employment action would
likely chill the exercise of constitutionally protected speech."
420 F.3d at 1300. In Akins, the Eleventh Circuit noted that it
had "decided that, as a matter of law, important conditions of
employment include discharges, demotions, refusals to hire or
promote, and reprimands." Id. (citations omitted). The Akins
court summed up this prong: "if an employer's conduct negatively
affects an employee's salary, title, position, or job duties, that
conduct constitutes an adverse employment action." Id.

AO 72A
(Rev. 8/82)

**B. Deal in his Official Capacity is Entitled to Summary Judgment**

When a plaintiff sues an officer in his official capacity, the action is not against the officer but against the entity of which the officer is an agent; "[s]uch suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). Further, "[w]hen suing local officials in their official capacities under § 1983, the plaintiff has the burden to show that a deprivation of constitutional rights occurred as a result of an official government policy or custom." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005).

Plaintiff has not argued that the City of Jesup has a custom related to this claim. Instead, Plaintiff seeks to hold the City liable by means of a policy. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Id. (citation omitted). When seeking to hold a city liable under § 1983 by suing a city official in his or her official capacity, the plaintiff must show that the official who committed the allegedly unconstitutional act had final policy making authority. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1291 (11th Cir. 2004) ("A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decisionmaking authority in a particular area.").

AO 72A
(Rev. 8/82)

"A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, and if the governing body lacks the power to reverse the member or employee's decision." Id. at 1292 (citations omitted). In other words, "a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997). The Court looks to "state and local positive law," to determine whether the official who allegedly undertook the unconstitutional act had the authority to bind the city with regard to that act. Id. (citation omitted).

i. **Deal was not the Final Policy Maker**

Plaintiff has averred that Defendant Deal in his official capacity acted as the City's final policy maker when he allegedly unconstitutionally fired Plaintiff in retaliation for her engaging in speech protected by the First Amendment. Defendant Deal in his official capacity has responded that he was not the final policy maker regarding the decision to terminate Plaintiff because the City Grievance Committee had plenary review over that decision. In support of this position, Defendant has produced the City of Jesup Employee Handbook, which establishes a Grievance Committee to hear "appeals from personnel regarding actions taken by the

city department heads or other supervisory personnel of the city."
Dkt. No. 14-1 at 11. The Committee is vested with the power to
"take such action concerning an affected employee as it deems
appropriate." Id. Indeed, Plaintiff attempted to take advantage
of the Committee's powers when she appealed Deal's termination
decision to the Committee. The Committee, of course, voted to
uphold Plaintiff's firing. Irrespective of the outcome, the point
is that the Committee had the power to overturn that decision and
to "take such action concerning [Plaintiff] as it deem[ed]
appropriate." Id.

Despite the Committee's powers, Plaintiff argues that a
reasonable jury could find that the Committee does not have
meaningful administrative review. Plaintiff's argument is based
solely on two statements that Deal made in his deposition. First,
Deal testified that "[m]y role is the final determination." Dkt.
No. 15-2 at 28. Second, Deal characterized himself as the top of
the organizational structure of the Jesup Police Department. Id.
at 49-50.

Plaintiff misstates the nature of the inquiry, and her
argument fails to overcome the inescapable conclusion that the
Grievance Committee provided meaningful administrative review of
Deal's decision to fire her. First, the Supreme Court has
"established that the final policymaker issue is a question of law
for the trial judge." Scala, 116 F.3d at 1402 n.4 (citing Jett v.

13

_Dallas Independent School District_, 491 U.S. 701, 737 (1989)). Second, the record provides undisputed evidence that the Grievance Committee had the power to reverse Deal's decision to terminate Plaintiff and to take any action it deemed appropriate regarding that decision. Further, the review by the committee was meaningful. Plaintiff was provided with an adversarial hearing that lasted hours. At that hearing, she was represented by counsel and able to present evidence and testimony by witnesses who were under oath. Given the robust, adversarial hearing and the committee's absolute power to take any action it deemed appropriate, Deal's decision was subject to meaningful administrative review. Accordingly, Plaintiff's claim against Deal in his official capacity must fail.

Notably, while on the subject, Defendants argue that Plaintiff's retaliation claim against Defendants Deal and Lewis in their individual capacities must fail because neither are a final policy maker. For this proposition, Defendants cite to _Scala_. _Scala_, however, only addresses the issue of whether a municipality can be held liable for its agents acts when that agent is sued in his or her official capacity. _Scala_'s focus on suits against municipal officers in their official capacity makes sense because the final policy maker doctrine only applies to claims of municipal liability and, as such, is inapposite to claims against state actors in their individual capacities.

14

For these reasons,[3] Defendant Deal's Motion for Summary Judgment with respect to Plaintiff's retaliation claim against Deal in his official capacity, Count I, is due to be **GRANTED**.

## C. Defendant Lewis in his Individual Capacity is Entitled to Summary Judgment

Defendant Lewis argues that Plaintiff has failed to establish any facts showing that he made the decision to take the two adverse employment actions against her, i.e., her suspension without pay and her termination. Under the summary judgment framework, Defendant has satisfied his burden of showing an absence of a genuine issue of material fact on this element of Plaintiff's claim. Accordingly, the burden shifts to Plaintiff to show that a genuine issue of material fact exists on this element.

Plaintiff cannot satisfy her burden. Indeed, Plaintiff has failed to allege in her Complaint let alone provide evidence in the record of any actions taken by Lewis that could be construed as an adverse employment action. See Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004) (explaining that an individual is generally only liable under § 1983 "for his own personal

---

[3] For the same reasons that Deal in his individual capacity is entitled to summary judgment, set forth in Part I.D. *infra*, the Court finds that Plaintiff's First Amendment retaliation claims against Deal in his official capacity fail even if Deal was the final policy maker.

AO 72A
(Rev. 8/82)

actions").[4]   Thus, Plaintiff has not satisfied her burden, and Defendant Lewis is entitled to judgment as a matter of law on these claims.   Accordingly, Defendant Lewis's Motion for Summary Judgment with respect to Plaintiff's First Amendment retaliation claims is due to be **GRANTED**.

## D. Defendant Deal in His Individual Capacity is Entitled to Summary Judgment

Deal argues that he is entitled to summary judgment because no reasonable jury can find for Plaintiff on her First Amendment retaliation claims against him for multiple reasons:  Deal's involvement in Plaintiff's termination was minimal; Plaintiff's statement to Jocelyn during the traffic stop was not protected; and Plaintiff's statement at the C.I.T. training did not play a substantial or motivating role in her termination.

Turning to Defendant's first argument, Deal did take an adverse employment action against Plaintiff when he made the decision to terminate Plaintiff.  Although this decision was based on Chief Takaki's recommendation and could be appealed and overturned by the Grievance Committee, Deal made that decision,

---

[4] <u>Holloman</u> also notes that under certain limited circumstances an individual may be liable on a supervisory theory for the actions of his subordinates.  <u>Holloman</u>, 370 F.3d at 1263.  Here, Plaintiff sets forth no evidence that could give rise to supervisorial liability for Defendant Lewis.

AO 72A
(Rev. 8/82)

which impacted Plaintiff's position. Thus, he took an adverse employment action against Plaintiff.

Turning to Plaintiff's statement to Jocelyn at the traffic stop, Defendant argues that no reasonable jury could find that Plaintiff's statement was speech protected under the First Amendment. The Supreme Court has established a two-step inquiry for determining whether a public employee's speech is constitutionally protected. First, courts must determine "whether the employee spoke as a citizen on a matter of public concern." Alves v. Bd. of Regents of the Univ. Sys. of Georgia, 804 F.3d 1149, 1159 (11th Cir. 2015) (quoting Carcetti v. Ceballos, 547 U.S. 410, 418 (2006)). If the employee did not, then the speech is not protected. Deal argues that this first step is not satisfied as a matter of law because Plaintiff's speech was not made "as a citizen" and was not "on a matter of public concern." Dkt. No. 13-1 at 13 (quoting Alves, 804 F.3d at 1159).

"As to the 'citizen' requirement, the Supreme Court has held that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" 804 F.3d at 1160 (quoting 547 U.S. at 421). "The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those

17

duties." <u>Lane v. Franks</u>, 573 U.S. 228, 240 (2014). "After <u>Lane</u>, the exception to First Amendment protection in <u>Garcetti</u> for 'speech that owes its existence to a public employee's professional responsibilities,' must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." 804 F.3d at 1162 (quoting <u>Garcetti</u>, 547 U.S. at 421-22).

Here, a reasonable jury could find that Plaintiff was speaking as a private citizen when she told Jocelyn that she should not allow her car to be searched. The statement was not "made in accordance with or in furtherance of the ordinary responsibilities of her employment." 804 F.3d at 1162. Instead, Plaintiff was giving advice to a close friend, who she viewed as a daughter. Although the speech concerned the ordinary responsibilities of her employment as a police officer, the speech did not further those responsibilities. In fact, the speech did the opposite because it was made in contravention of her ordinary responsibilities, as the internal investigation found. Thus, the Court must turn to the second question of whether the speech at issue was on a "matter of public concern."

"The second requirement—that the speech address a matter of public concern—concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of

only personal interest." Id. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To fall within the realm of 'public concern,' an employee's speech must relate to 'any matter of political, social, or other concern to the community.'" 804 F.3d at 1162 (quoting Connick, 461 U.S. at 146). Finally, courts are to look at the "main thrust" of the speech, i.e., whether the speech is "essentially public in nature or private." Id. (citation omitted).

The main thrust of Plaintiff's speech was on a matter of private concern, and no reasonable jury could find otherwise. Plaintiff was trying to protect Jocelyn by advising her of her rights. Although there is of course public concern in the protections of the Fourth Amendment, Plaintiff was not speaking to these protections in relation to the community but was speaking to these protections in the specific context of the police searching Jocelyn's car. Given this context, content, and the form of the statement (over a private telephone call), no reasonable jury could find that Plaintiff's speech addressed a matter of public concern. Thus, Plaintiff has not satisfied her burden of creating a genuine issue of material fact on the element of whether her speech to Jocelyn during the traffic stop was protected under the First

Amendment. Accordingly, this claim against Deal in his individual and official capacity must fail.

Turning to Plaintiff's statement at the C.I.T. training, i.e., "[t]here's going to be some changes around here," dkt. no. 20-2 ¶ 53, no reasonable jury could find a causal connection between that statement and her suspension or termination. Deal argues that Lewis is the only Defendant who has been alleged to have heard the comment, and that Plaintiff has not alleged "that Deal, or anyone else who had a part in the termination process, knew of Smith's remark, let alone [set forth] any actual evidence that could be used to prove that the remark influenced the termination decision." Dkt. No. 13-1 at 14.

Plaintiff responds that the record contains sufficient circumstantial evidence to establish a causal connection. Plaintiff first points to Lewis and Deal's close relationship noting that the two have known each other since the early 1970s and that Lewis testified he could simply call Deal if he wanted to be the Jesup Police Chief after Chief Takaki retired. Further, Plaintiff argues that a reasonable inference can be drawn that Deal became red-faced at the C.I.T. training in response to Plaintiff's comment, not because of a purported health issue. Finally, Plaintiff points to the fact that Lewis testified regarding other personnel decisions that he tells Deal who he wants, which, Plaintiff argues, raises the reasonable inference

AO 72A
(Rev. 8/82)

that "Lewis also ran who he *didn't* want by the city manager." Dkt. No. 20-1 at 15.

Considering this evidence, Plaintiff falls far short of meeting her burden of showing a genuine issue of material fact as to whether Plaintiff was suspended or fired on the basis of her allegedly protected speech at the C.I.T. training. Plaintiff's circumstantial evidence establishes, at most, that Lewis had the *ability* to influence Deal's decision to fire Plaintiff (Deal did not have a role in Chief Takaki's decision to suspend Plaintiff). Pertinently, there is no evidence that Lewis did in fact influence, or attempt to influence, Deal. Further, even if Lewis did ask Deal to fire Plaintiff—to be clear, there is no evidence in the record that he did—Plaintiff has not shown any evidence that he sought Plaintiff's firing *because of* Plaintiff's speech. For these reasons, no reasonable jury could find a causal connection between Plaintiff's statement at the C.I.T. training and her suspension or firing.

For these reasons, Deal is entitled to summary judgment with respect to Plaintiff's First Amendment retaliation claims. Further, turning back to Deal in his official capacity, the reasons that Plaintiff's retaliation claims fail against Deal in his individual capacity are sufficient for a finding of the same for these claims against Deal in his official capacity. Accordingly, Deal's Motion for Summary Judgment with respect to Plaintiff's

First Amendment retaliation claims against him in his individual (and official) capacity is due to be **GRANTED**.

## II. Title VII Disparate Treatment on the Basis of Race Claims

For these claims set forth in Count II of the Complaint, Plaintiff argues that her suspension and firing were because of her race as an African-American. These claims are against Defendant Deal in his official capacity as the City Manager of the City of Jesup, Georgia and not Deal in his individual capacity or against Lewis. "Individual capacity suits under Title VII are similarly inappropriate. The relief granted under Title VII is against the *employer,* not individual employees whose actions would constitute a violation of the Act." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." "This provision forbids 'disparate treatment' of, or 'intentional discrimination' against, employees on the basis of race or national origin." Jefferson v. Sewon Am., Inc., 891 F.3d 911, 920 (11th Cir. 2018) (quoting Equal Emp't Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015)). To be successful, an employee must establish

AO 72A
(Rev. 8/82)

"discriminatory intent through either direct evidence or circumstantial evidence." Id. (internal quotation marks and citation omitted). The analysis for a disparate treatment claim is different depending on whether the employee is attempting to establish her claim by direct or circumstantial evidence. Here, Plaintiff did not allege in her Complaint direct evidence of discrimination. Further, Plaintiff has not set forth any direct evidence in her response to this Motion. Thus, Plaintiff is proceeding on a theory of circumstantial evidence.

"Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas paradigm for circumstantial evidence claims." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000). Under that framework, a plaintiff must first establish a prima facie case of racial discrimination. "To make out a *prima facie* case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

Here, the City only disputes whether Plaintiff can establish the final element—that the City of Jesup treated similarly situated, non-African-American employees more favorably.

As part of the Title VII plaintiff's prima facie case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself. To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).

Defendants argue that Plaintiff has not established a similarly situated employee. Under the summary judgment standard, Defendant has met its burden of showing an absence of a genuine issue of material fact as to whether Plaintiff can satisfy this element of her claim. The burden, then, shifts to Plaintiff to provide evidence in the record showing that a genuine issue of fact does exist on this issue. Plaintiff has not met her burden.

AO 72A
(Rev. 8/82)

Plaintiff has failed to sufficiently show a similarly situated employee outside of her protected class, i.e., a comparator. The sole comparator that Plaintiff points to is Lewis. The record evidence that Plaintiff sets forth to establish Lewis as a comparator is Lewis's testimony that he once "went through a wreck that was involving my cousin." Dkt. No. 15-3 at 31. This evidence is not enough to establish Lewis as a comparator because it does not show that Lewis was "involved in or accused of the same or similar conduct." Holifield, 115 F.3d at 1562. Here, Plaintiff inserted herself in a traffic stop by instructing Jocelyn via telephone to refuse a search of her vehicle, and then Plaintiff drove to the traffic stop despite being commanded not to do so. Plaintiff has not established that Lewis is similarly situated in either of these two respects and has not attempted to establish another similarly situated employee. Finally, Plaintiff has set forth no other evidence of discrimination. Accordingly, Defendants' Motion for Summary Judgment with respect to Plaintiff's disparate treatment claims, Count II of the Complaint, is due to be **GRANTED**.

### III. Section 1985(3) Conspiracy to Violate Civil Rights Claim

"To establish a violation of § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in

AO 72A
(Rev. 8/82)

furtherance of the conspiracy (4) resulting in an injury to person or property, or a deprivation of any right or privilege of a citizen of the United States." Pace v. Peters, 524 F. App'x 532, 536 (11th Cir. 2013). "In order to establish a § 1985(3) conspiracy claim, [a plaintiff] must show an agreement between 'two or more persons' to deprive him of his civil rights." Dickerson v. Alachua Cty. Comm'n, 200 F.3d 761, 767 (11th Cir. 2000) (quoting 42 U.S.C. § 1985(3)).

Defendants have argued that Plaintiff has neither alleged nor provided any evidence of an agreement between them in any capacity, let alone an agreement to deprive Plaintiff of her civil rights. Defendant has thus met its burden of demonstrating the absence of a genuine issue of material fact on this element of Plaintiff's claim. Again, the burden shifts to Plaintiff to set forth evidence in the record showing that a genuine issue of fact does exist. Plaintiff has not satisfied this burden and has not attempted to. Plaintiff's response brief to this Motion wholly ignores, i.e., does not address, Defendants' argument that the record contains no evidence of an agreement to deprive Plaintiff of her civil rights. Accordingly, Defendants' Motion for Summary Judgment with respect to Plaintiff's conspiracy claim is due to be **GRANTED**.

## CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment, dkt. no. 13, is **GRANTED** with respect to all claims. The Clerk of Court is **DIRECTED** to close this case.

**SO ORDERED**, this 27th day of February, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)